IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Ridi Holland LLC, et al.,                      Case No. 3:23-cv-02334-JGC

      Plaintiffs,

   v.

North Holland Sylvania Road Center, LLC, et al.,

      Defendants.

**ORDER**

This is a contract dispute regarding the renewal of leases to operate four gas stations in the Toledo, Ohio, area.

Plaintiffs are the gas station lessees who operate the stations at issue (the "Operators"). The Operators include five Ohio limited liability companies with their principal places of business in Lucas County, Ohio, and Mr. Dergham Ridi. Mr. Ridi is an individual lessee residing in Lucas County, Ohio. (Doc. 1-2, PgID. 20; Doc. 8, PgID. 1355).

Defendants are the gas station lessors who own and supply with petroleum products the stations at issue (the "Owners"). The Owners include six Georgia limited liability companies with their principal places of business in Gwinnett County, Georgia. (Doc. 1-5, PgID. 218–19).

The Operators sued the Owners in the Lucas County Court of Common Pleas seeking a declaratory judgment that their lease renewals were effective and alleging breach of contract. (Doc. 1-2, PgID. 39–41). The Owners brought counterclaims against two of the Operators, Mr. Ridi and S and G Stores (the corporate entity through which Mr. Ridi runs his business), alleging breaches of contract, related tort claims, and violations of the Lanham Act and Ohio's Deceptive

1

Trade Practices Act. (Doc. 1-6, PgID. 300–18). The Owners then removed the case to this court. (Doc. 1).

Pending is the Owners' motion for a preliminary injunction related to their Lanham Act claim. (Doc. 3). The Operators opposed the motion, (Doc. 16), and the Owners replied, (Doc. 19). The Owners then requested a hearing on the motion, which I granted. The Owners filed a post-hearing brief, (Doc. 53), the Operators filed a response, (Doc. 54), and the Owners filed a reply, (Doc. 55).

For the reasons that follow, I deny the Owners' motion for a preliminary injunction.

**Background**

The Owners have agreements to supply petroleum products not just to the Operators in this case, but to about 850 gas stations across the country (though mostly concentrated in the southeastern United States). (*See* Hearing Tr., Doc. 50, PgID. 4995–96). To sustain that fuel supply, the Owners must maintain relationships with major upstream fuel providers such as, in this case, Sunoco. (*Id.*). As fuel distributors, the Owners sit toward the middle of the oil and gas industry's retail supply chain, helping connect bulk producers and distributors of petroleum products with outlets, like the sites that the Operators run, for the sale of those products to individual consumers.

The Owners rely on a network of about 500 to 600 fuel dealers, such as the Operators here, to run many of the gas stations that the Owners supply. (*Id.* at PgID. 4832, 4996–97). A web of agreements creates and defines the business relationship between distributors such as the Owners, dealers such as the Operators, and bulk fuel providers such as Sunoco.

In 2009, the Owners purchased from Sunoco the four gas station sites at issue in this case. (Doc. 28-17, PgID. 2066; Doc. 28-18, PgID. 2103; Doc. 28-19, PgID. 2140; Doc. 28-20, PgID.

2177).¹ A condition of each of these sales was that the Owners agree to "a Distributorship Agreement . . . supplying Sunoco branded motor fuels, for a term of at least fifteen (15) years." (*E.g.*, Doc 28-20, PgID. 2185). Each sale agreement also gave Sunoco the right to repurchase the property if, at any time during the fifteen-year period after the sale, the Owners "terminate[] [their] Distributor Branded Motor Fuel Agreement with Sunoco" or the Owners "discontinue[] the supply of Sunoco branded motor fuel to the Premises for any reason." (*E.g.*, *id.* at PgID. 2186).

The Operators currently run a total of 65 gas station and convenience store sites across Michigan and Ohio. (Hearing Tr., Doc. 51, PgID. 5087–88). In 2013, the Owners and Operators entered new leases for the four sites at issue here. (Doc. 25-4, PgID. 1608; Doc. 25-8, PgID. 1643; Doc. 25-13, PgID. 1678; Doc. 25-17, PgID. 1713). Each of the four leases provided for an initial lease term running to January 31, 2018. (*E.g.*, Doc. 25-4, PgID. 1608). Each lease also provided the Operators with an option to renew for two additional five-year terms. The first renewal term would run from February 1, 2018, to January 31, 2023. (*E.g.*, *id.*). The second renewal term would run from February 1, 2023, to January 31, 2028. (*E.g.*, *id.*). Each lease established the same renewal procedure, which required the Operators to exercise their renewal option "by written notice given to [the Owners] no less than three hundred sixty-five (365) days prior to the initial Term." (*E.g.*, *id.*). A provision in each lease titled "Service of Notice"

---

¹ The addresses of these sites are: 3503 Hill Avenue, Toledo, OH 43607 (the "Hill Avenue site"), (Doc. 25-4, PgID. 1608); 247 North Holland Sylvania Road, Toledo, OH 43615 (the "North Holland site"), (Doc. 25-8, PgID. 1643); 3510 Moline Martin Road, Millbury, OH 43447 (the "Moline Martin site"), (Doc. 25-13, PgID. 1678); and 4810 Suder Avenue, Toledo, OH 43611 (the "Suder Avenue site"), (Doc. 25-17, PgID. 1713).

3

provided in part that "[a]ll notices shall be given via personal delivery or sent via U.S. Mail." (*E.g.*, *id.* at PgID. 1615).[2]

Each site's lease required that the Operators maintain a gas station at the site. (*See, e.g.*, *id.* at PgID. 1609 ("Tenant shall use the Premises for convenience store [sic], the retail sale of gasoline and other petroleum products, and the sale of prepared food, including deli foods and fried chicken.")).[3]

Each lease also required the Operators to contract with the Owners for a supply of petroleum products to the site. (*See, e.g.*, *id.* at PgID. 1616 ("Tenant's rights hereunder are expressly conditioned upon Tenant entering into a Dealer Supply Agreement with [the Owners or their designee] for the exclusive supply of petroleum products to the Premises . . . .")). The Operators duly entered into such supply agreements with the Owners for each of the four sites. (Doc. 28-2; Doc. 28-6; Doc. 28-10; Doc. 28-13). Renewal of each site's lease automatically renewed the site's related supply agreement. (*E.g.*, Doc. 28-2, PgID. 1942).

Both the site leases and the related supply agreements contain provisions protecting the brand and trademarks associated with the petroleum products that the Operators purchase from the Owners. The leases require that the Operators "take all action reasonably necessary to maintain the applicable petroleum brand at the location." (*E.g.*, Doc. 25-4, PgID. 1611). And Section 10 of the supply agreements, titled "Trademarks and Names," provides in relevant part:

> Customer expressly agrees that all of Supplier's (or Supplier's suppliers') trademarks, names, and colors appearing at the Premises shall be kept clear and legible, and that Customer will use only signs approved by Supplier to advertise products purchased by Customer from Supplier. . . . Upon any termination of this

---

[2] The parties dispute whether this provision covers all notices provided under the leases or only notices from the Owners to the Operators. (*Compare* Doc. 53, PgID. 5362, *with* Doc. 54, PgID. 5406). For reasons further discussed below, I decline to reach that question in this order.

[3] Of course, as Mr. Ridi's testimony indicated, customers primarily visit gas stations to purchase gas. (Hearing Tr., Doc. 51, PgID. 5210). A customer's purchase of other items is, as the contract provision itself suggests, merely a matter of convenience.

> Agreement, rights to use trademarks, names, or colors shall terminate immediately, and Customer agrees to remove or paint out any such marks, names, or colors from the Premises. Customer agrees that, under no circumstances, will Supplier's (or its suppliers') trademarks, names, or colors be employed to identify products originating from any source other than Supplier . . . .

(*E.g.*, Doc. 28-2, PgID. 1945). Because the Owners' separate agreements with Sunoco required the Owners to supply Sunoco products to the leased sites, these provisions functioned in practice as restrictions on the Operators' use of the Sunoco brand, trademarks, and related trade dress.[4]

On December 28, 2016, about one month before the first renewal term's deadline for notice of renewal, the Operators provided the Owners that notice for three of the four sites. (Doc. 25-20, PgID. 1745; Doc. 28-26; Doc. 28-27; Doc. 28-28). The Operators, in apparent compliance with the terms and conditions of the lease agreements, provided this notice through both email and regular mail. (*See* Doc. 25-20, PgID. 1745–46; Hearing Tr., Doc. 51, PgID. 5100–01). In his email providing the Operators' notices of renewal, Mr. Ridi wrote in relevant part, "Please see attached letters notifying you of our intent to Renew all leases except Hollands sylvania location." (Doc. 25-20, PgID. 1745). The lease renewal letters themselves read in relevant part that "[the Operators are] exercising our right to renew the Commercial Real Estate Lease Agreement" for each of the three sites through January 31, 2023. (*E.g.*, Doc. 28-26, PgID. 2236).

The Operators refused to renew the lease for the North Holland site unless the Owners agreed to a rent reduction. (Doc. 25-20, PgID. 1745; Doc. 28-29). Negotiations over this issue dragged on into early 2018. (*See* Doc. 25-24, PgID. 1756; Doc. 25-27, PgID. 1763; Hearing Tr., Doc. 51, PgID. 5104–05). During these discussions, the Operators emphasized their willingness to invest in the three sites with renewed leases "because we will be there for at least the next ten

---

[4] The Distributor Branded Motor Fuel Agreement between Sunoco and the Owners, which the Owners filed under seal, also restricts the use of Sunoco trademarks by both the Owners and any authorized dealers. (Doc. 31-1, PgID. 2408–09, 2429–31). That agreement sets out Sunoco's brand appearance standards and requirements. (*Id.* at PgID. 2429–31).

years, meaning until the end of the third term." (Hearing Tr., Doc. 51, PgID. 5103). The Operators argued that they could not "buy new pumps for [the North Holland site] . . . unless the lease [was] modified where the rent justifies the sales so we can buy new dispensers and keep the sites for the next ten years." (*Id.*; *see also* Doc. 25-24, PgID. 1756 (email from Mr. Ridi to the Owners in part seeking agreement on a rent reduction for the North Holland site "because we want to buy new Pumps . . . and I want to make sure we will be there for the next 10 years")).[5] The Owners, however, did not waive any site lease's renewal notice requirement during these negotiations. (Hearing Tr., Doc. 51, PgID. 5104).

In May 2018, the two sides finally reached agreement on a reduction of rent for the North Holland site and on the Operators' purchase of new pumps for that site. (*Id.* at PgID. 5105–06; Doc. 25-27, PgID. 1763; Doc. 28-15). The resulting lease amendment renewed the Operators' North Holland site lease until January 31, 2023, but did not otherwise modify the original lease's renewal provisions. (Doc. 28-15, PgID. 2062). The amendment also did not modify the leases of the three other sites at issue here. (*Id.*).

Before, during, and after the negotiations over renewal of the North Holland site lease, the Operators continued to invest in the Moline Martin, Hill Avenue, and Suder Avenue sites. At the Moline Martin site, which functions as a truck stop, the Operators in 2016 spent an estimated $300,000 to $400,000 on upgrading the site's diesel services. (Hearing Tr., Doc. 51, PgID. 5211–13; Doc. 25-32, PgID. 1785). And a year or two later, the Operators spent a further $65,000 to upgrade the site's gasoline pumps. (Hearing Tr., Doc. 51, PgID. 5156–58; Doc. 25-21, PgID. 1748). The Operators discussed but ultimately declined financing this upgrade through a seven-

---

[5] Testimony at the hearing indicated that some sites needed new pumps so that customers could use credit cards, including Sunoco-branded credit cards, to purchase fuel at the pump. (*See* Hearing Tr., Doc. 51, PgID. 5172, 5211–12). The Operators agreed to pay for the upgrades, but both parties benefited from the investment.

6

year loan from the Owners with a payment period that would have extended into the Moline Martin site's second renewal term. (Hearing Tr., Doc. 51, PgID. 5156–58; Doc. 25-22, PgID. 1752). The Operators made similar gasoline-pump investments at the Suder Avenue and Hill Avenue sites. (Doc. 25-31 (ordering new pumps in 2018 costing $47,124 for the Suder Avenue site); Hearing Tr., Doc. 51, PgID. 5166–67, 5191–92 (explaining that the total cost of new pump installation for the Suder Avenue site was about $60,000 and that the Hill Avenue site received new pumps in October or November 2021); Doc. 25-32, PgID. 1783–85 (discussing a quote in March 2021 for new pumps for the Hill Avenue site)).

But not every site the Operators leased from the Owners performed well. Of relevance to this case, a fifth site at Heatherdowns Boulevard consistently struggled. (Hearing Tr., Doc. 51, PgID. 5135; Doc. 25-25, PgID. 1758).[6] Before renewing their lease from the Owners for the Heatherdowns site, the Operators sought a rent reduction for the renewal term. (*See* Doc. 25-25, PgID. 1758; Doc. 25-32, PgID. 1783; Hearing Tr., Doc. 51, PgID. 5173). The Owners refused that reduction in April 2021 and offered to take back the Heatherdowns site. (Doc. 25-33, PgID. 1787). The Operators agreed, and the parties signed a lease termination agreement in June 2021. (Doc. 25-38). The Operators' options to renew their leases at both the Moline Martin and Hill Avenue sites, however, had been contingent on their renewal of the Heatherdowns site lease. (Doc. 28-1, PgID. 1928; Doc. 28-5, PgID. 1963). The parties therefore agreed to a clause in the Heatherdowns termination agreement providing that the termination "will not affect any existing rights [the Operators have] to renew existing leases for other properties." (Doc. 25-38, PgID. 1794; *see also* Doc. 25-35, PgID. 1789; Doc. 28-32, PgID. 2244; Hearing Tr., Doc. 51, PgID. 5112–13).

---

[6] The address of the Heatherdowns site is 4411 Heatherdowns Boulevard, Toledo, OH 43614. (Doc. 25-38, PgID. 1793).

During this negotiation, Mr. Ridi sent an email on May 27, 2021, to the Owners stating that "[o]ur intention is to exercise the renewal option at all remaining sites once the current term expires." (Doc. 28-32, PgID. 2244). The Operators argue that this statement suffices as the contractually required written notice to the Owners exercising the Operators' option to renew the leases of the four sites at issue. (Doc. 54, PgID. 5394–400). Unlike when they renewed the site leases in 2016, however, the Operators did not follow up their emailed statement with a mailed written communication. (Hearing Tr., Doc. 51, PgID. 5110).

The May 27, 2021 email was the only express notice of the Operators' intent to renew the site leases that the Operators sent prior to January 31, 2022, the deadline for the Operators' notices of renewal. Perhaps believing that their intent to remain at the sites through the end of the second renewal term in 2028 was clear, the Operators did not restate that intent within the appropriate timeframe and in accordance with the express terms of the lease agreements. The issue in this case is therefore the effect of the Operators' failure to comply with the lease agreements' temporal requirements for notices of renewal. And this case arises solely because of how the Operators expressed their notice of renewal—that is, in a manner other than that permitted under the lease agreements.

On February 9, 2022, nine days after the expiration of the second renewal notice period on January 31, the Owners provided the Operators with notices of lease expiration for each of the sites. (*E.g.*, Doc. 28-33). These notices clearly informed the Operators that, from the Owners' perspective, the Operators had no right to continue to occupy the premises and operate the gas stations.

These notices also prompted a flurry of subsequent communication between the parties. During a phone call on February 11, 2022, the Operators initially explained their position that

8

Mr. Ridi's May 27, 2021 email to the Owners served as adequate written notice of renewal. (Doc. 25-39, PgID. 1796; Doc. 25-40, PgID. 1797; Hearing Tr., Doc. 51, PgID. 5179–81).

The Operators conveyed that message again on March 9, 2022, when Mr. Ridi met with Pat Dillon, one of the Owners' senior executives, and John Berry, the Owners' local area manager, at Mr. Ridi's Toledo offices. (Doc. 39-7, PgID. 2537). During his testimony at the hearing about this meeting, Mr. Ridi described turning his computer screen to show Mr. Dillon a copy of the May 27th email. (Hearing Tr., Doc. 51, PgID. 5185–87). According to Mr. Ridi, in response Mr. Dillon apologized for the mix-up, and the discussion then moved to other issues. (*Id.* at PgID. 5187).

During their testimony at the hearing about this meeting, however, both Mr. Dillon and Mr. Berry contradicted Mr. Ridi's characterization of Mr. Dillon's response. (Hearing Tr., Doc. 50, PgID. 4877; Hearing Tr., Doc. 52, PgID. 5321). According to Mr. Berry, Mr. Dillon's response to Mr. Ridi was simply to restate the Owners' position that the Operators had failed to renew the site leases. (Hearing Tr., Doc. 50, PgID. 4877).

On April 11, 2022, the Operators sent the Owners an email with its subject line reading "S&G Lease Renewal Reminder." (Doc. 25-41, PgID. 1799). The email included as attachments another copy of Mr. Ridi's May 27th email and a signed letter from Mr. Ridi to the Owners. (*Id.* at PgID. 1800–02). That letter read, "Just sending you a friendly reminder that we exercised our option to renew our leases in the email dated on May 27, 2021." (*Id.* at PgID. 1802). The letter also stated that it was "in reference to" the four sites at issue and provided a list of those sites. (*Id.*).

On January 30, 2023, a day before the expiration of the site leases' first renewal term, the Owners sent the Operators written demands for possession of each of the sites. (Doc. 28-37; Doc.

9

28-38; Doc. 28-39; Doc. 28-40). The Owners followed up with notices of franchise nonrenewal on July 18, 2023, (Doc. 28-41; Doc. 28-42; Doc. 28-43; Doc. 28-44), and of lease termination on September 27, 2023, (Doc. 28-45; Doc. 28-46; Doc. 28-47; Doc. 28-48).

These terminations became effective on October 18, 2023. On that date, the Owners stopped supplying the Operators with Sunoco fuel at the disputed sites. (Hearing Tr., Doc. 51, PgID. 5125).

After the parties' last-ditch attempt to resolve the dispute failed, (*see* Doc. 25-42), the Operators obtained the fuel necessary to continue their operations from suppliers other than Sunoco. (Hearing Tr., Doc. 51, PgID. 5125, 5193–95). The Operators also partially concealed the sites' Sunoco branding and trade dress. This effort included in some instances covering Sunoco's trademarks with the Operators' own proprietary branding. (*Id.* at PgID. 5125–29, 5208; Docs. 25-71 through 25-82; Doc. 28-54, PgID. 2365–86). The Operators have since continued to sell non-Sunoco fuel at the disputed sites. (*See* Hearing Tr., Doc. 51, PgID. 5210, 5226–27). The Owners' pending motion for a preliminary injunction rests on the Operators' alleged violations of the Lanham Act through the Operators' continued use of the Sunoco brand and trademarks. (Doc. 1; Doc. 3).[7] The Owners ask that I enjoin the Operators' sale of fuel at the disputed sites during the pendency of this litigation, as well as grant any other necessary and just relief. (Doc. 3, PgID. 768, 784).

**Legal Standard**

---

[7] In the week before removing this case to federal court, the Owners filed four complaints in state court seeking the Operators' eviction from the four sites at issue here. (Doc. 20, PgID. 1531). On January 26, 2024, the Operators filed a motion asking me to stay these state court proceedings. (*Id.*). I will address this motion in a separate order after I have conferred with the parties as to the status of these state court proceedings and, if necessary, provided the parties an opportunity for further briefing on the motion.

10

A preliminary injunction "is typically an extraordinary remedy reserved only for cases where [such an injunction] is necessary to preserve the status quo until trial." *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024) (quotations and citations omitted).

> The weight of four factors must support the grant of a motion for a preliminary injunction: (1) whether the movant is likely to succeed on the merits of the lawsuit, (2) whether the movant is likely to suffer irreparable harm without the injunction, (3) whether the balance of equities tips in favor of the movant, and (4) whether the injunction is in the public's interest.

*Id.* "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "At the preliminary injunction stage, [the movant] must show more than a mere possibility of success, but need not prove his case in full." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quotations and citations omitted).

"The movant bears the burden of proving that the circumstances clearly demand the injunction." *Ohio v. Becerra*, No. 21-4235, 2022 WL 413680, at *2 (6th Cir. Feb. 8, 2022) (quotations and citations omitted); *see PFG Ventures, L.P. v. Kennedy*, No. 22-cv-01177, 2022 WL 2900713, at *5 (N.D. Ohio July 22, 2022) (Calabrese, J.) ("[A]lthough some cases purport to apply the clear-and-convincing standard[,] . . . those cases in turn rely on precedent demanding that the party seeking an injunction prov[e] that the circumstances clearly demand such an extraordinary remedy." (quotations and citations omitted)).

## Discussion

### 1. Likelihood of Success

The Owners base their motion for a preliminary injunction enjoining the Operators' sale of fuel at the disputed sites on the Operators' alleged violations of the Lanham Act. (Doc. 1-6, PgID. 300–04; Doc. 3, PgID. 775–76, 778–84; Doc. 53, PgID. 5370–80). That Act "prohibits the

unauthorized use of a registered trademark when selling or advertising a good or service using the trademark is likely to confuse or deceive consumers." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1188 (6th Cir. 1997).[8]

"[P]roof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion.'" *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 464 (6th Cir. 2022) (quoting *U.S. Structures*, 130 F.3d at 1190).

The Operators do not dispute that their license to use the Sunoco brand and trademarks stemmed from their lease and supply agreements with the Owners. Whether the Owners have shown a likelihood of success on the merits of their Lanham Act claim therefore depends upon whether the Operators renewed those agreements. Both sides devote much of their briefing to arguments regarding the proper application of Ohio law to this renewal issue. (Doc. 3, PgID. 777–78; Doc. 16, PgID. 1429–36; Doc. 19, PgID. 1511–15; Doc. 53, PgID. 5360–69; Doc. 54, PgID. 5394–409; Doc. 55, PgID. 5420–28).[9]

---

[8] Specifically, the statute provides in relevant part for the civil liability of:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a)(1)(A).
  Also, although Sunoco and not the Owners own the trademarks at issue in this case, *see* Doc. 31-1, PgID. 2409 (filed under seal), the Lanham Act provides that "any person who believes that he or she is or is likely to be damaged by" a violation of the Act may bring a claim under it. § 1125(a)(1).

[9] I note that the leases for the Moline Martin and Hill Avenue sites, as well as the supply agreements for all four sites, provide that the agreements "shall be construed according to the laws of the State of Georgia." (Doc. 25-4, PgID. 1618; Doc. 25-13, PgID. 1688; Doc. 28-2, PgID. 1949; Doc. 28-6, PgID. 1984; Doc. 28-10, PgID. 2018; Doc. 28-13, PgID. 2050). Because no party argued for or discussed the application of Georgia law to this dispute, I consider the issue waived for purposes of this proceeding. *See Solo v. United Parcel Serv. Co.*, 947 F.3d 968, 972 n.2 (6th Cir. 2020); *Babcock Power, Inc. v. Kapsalis*, No. 13-cv-717, 2017 WL 1206012, at *1–2 (W.D. Ky. Mar.

Those arguments largely revolve around whether I should apply to the facts of this case the equitable principles explained in *Ward v. Washington Distributors, Inc.*, 425 N.E.2d 420 (Ohio Ct. App. 1980). The court in that case gave equitable relief to a lessee who had failed to comply with the lease's requirements regarding renewal notice timing. *Id.* at 423–24. At the beginning of this year, however, the Supreme Court of Ohio recognized a conflict within Ohio law on this issue. *Ashland Glob. Holdings, Inc. v. SuperAsh Remainderman Ltd. P'ship*, 225 N.E.3d 1177 (Ohio Ct. App. 2023), *certified conflict accepted*, Determination of Conflict, No. 2023-1588 (Ohio Jan. 24, 2024).[10] The Supreme Court of Ohio has not yet published its decision, which in my view will control the ultimate outcome of this case.

Generally, "[w]hen the state's highest court has not spoken on [an] issue, the federal court is called upon to predict what that court would do if confronted with the question." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015). In such a scenario and "[a]bsent controlling decisions[,] . . . '[I] must predict how the court would rule by looking to all the available data.'" *Id.* (quoting *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)). "The sources of data that may guide [my] determination include the decisions (or dicta) of the [state supreme court] in analogous cases, pronouncements from other [state] courts, restatements of law, commentaries, and decisions from other jurisdictions." *Id.*

---

30, 2017) (where both parties cited Kentucky law on substantive issues and neither addressed a choice-of-law provision selecting Massachusetts law, "deem[ing] the choice of law question abandoned").

[10] In *Ashland*, Ohio's Tenth District Court of Appeals noted that "[a] significant number of Ohio courts have applied the equitable principles announced in *Ward* with approval." *Ashland*, 225 N.E.3d at 1188 (collecting cases). But in *Fifth Third Bank Western Ohio v. Carroll Building Co.*, 905 N.E.2d 1284 (Ohio Ct. App. 2009), Ohio's Second District Court of Appeals explicitly rejected *Ward* and instead held that "[c]ases of contractual interpretation should not be decided on the basis of what is just or equitable; when both parties had equal bargaining power and there is no evidence of fraud or bad faith, a court will not save one party from an improvident contract." *Id.* at 1287. The Supreme Court of Ohio agreed to address this conflict among the state's appellate courts.

13

But attempting to predict a state supreme court's decision on an unsettled issue of state law while that court deliberates the very same issue seems to me a fool's errand. Here, no matter whether my decision might agree or disagree with that forthcoming from the Supreme Court of Ohio, my decision and its reasoning would have no persuasive value. *See Allstate*, 249 F.3d at 454 ("[Federal courts] apply state law in accordance with the controlling decisions of the state supreme court."). And whatever data might be available to me to chart "a reasonably clear and principled course" through Ohio law regarding equitable relief from lease renewal notice timing requirements, I see little point in that effort when the Supreme Court of Ohio is engaged in the very same task. *See Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). Ultimately, this unusual situation is one where "the interests of comity and cooperative judicial federalism" counsel that I not risk further muddying the waters in which the Supreme Court of Ohio is already swimming. *See Antioch Co. Litig. Tr. v. Morgan*, 633 F. App'x 296, 305 (6th Cir. 2015).[11]

The Owners' likelihood of success on their trademark infringement claim hinges on whether the Operators effectively exercised their options to renew the site leases. And whether the Operators' lease renewals were effective hinges on whether under Ohio law equity may provide relief to a party failing to comply with contractual requirements regarding lease renewal notice timing as explained in *Ward* and its progeny.

First, the record evidence indicates that the Operators failed to comply with the express terms of the lease agreements, which require timely written notices of renewal. On this point, the

---

[11] At a status conference with the parties on July 25, 2024, I asked them whether they desired that I certify the state-law issue in this case to the Supreme Court of Ohio so that they might be heard before that court. No party has yet asked me to do so, however, and because the Supreme Court of Ohio is already considering the issue, I decline to certify the question in this case sua sponte. I also suggested at that conference that, in the alternative, the parties seek leave to file amici briefs with that court.

Operators place great weight on their email sent to the Owners on May 27, 2021. (Doc. 54, PgID. 5394–400). But that email states only that "[o]ur intention is to exercise the renewal option at all remaining sites once the current term expires." (Doc. 25-34, PgID. 1788).

The evidence also indicates, however, that the Operators made repeated and substantial investments in the disputed sites on the understanding that they would remain at those sites through the end of the second renewal term. (*E.g.*, Doc. 25-22, PgID. 1752 (email exchange between the Owners and Operators discussing the possibility of financing site improvements through the Owners over a period of years that would extend into the second renewal term); Doc. 25-24, PgID. 1756 (email from Mr. Ridi to the Owners in part seeking agreement on a rent reduction for the North Holland site "because we want to buy new Pumps . . . and I want to make sure we will be there for the next 10 years")).

I conclude, based on the record from the hearing on the pending motion, that the Owners indisputably were aware of the Operators' desire *and intent* to remain as lessees through January 31, 2028. But under *Ward*, the Operators argue that, despite their failure to comply with the timing requirements for renewal notices in the leases, a court should nevertheless provide them with equitable relief from those requirements.[12]

---

[12] The Owners argue that even if *Ward* applies to this case, the Operators are still not entitled to relief under it because they "don't claim to be the victims of accident, fraud, surprise or honest mistake" as *Ward* requires. (Doc. 53, PgID. 5369). That argument ignores, however, that *Ward* "further held that, even in the absence of an honest mistake by the lessee, where the lessee has made valuable improvements to the leased premises, the lessee should not be denied equitable relief from his own neglect or inadvertence if a forfeiture of such improvements would result – provided, there is no prejudice to the landlord." *Ashland Glob. Holdings Inc. v. SuperAsh Remainderman Ltd. P'ship*, 225 N.E.3d 1177, 1187 (Ohio Ct. App. 2023) (quotations omitted). And the Owners have so far put forward no evidence of such prejudice, which "must arise from the delay itself" and must show that "the landlord [] changed his position in reliance upon the late notice." *Id.* at 1190 (quoting *Vivi Retail, Inc. v. E & A Ne. Ltd. P'ship*, No. 90527, 2008 WL 4263446, at *3 (Ohio Ct. App. Sept. 18, 2008)).

Here, if equitable principles do not trump formality as to the timing and mode of communication required by the contracts, the Operators will lose five years of continuing benefit from the over half million dollars they invested in permanent fixtures and improvements in the Owners' properties, investments in which the Owners concurred.

Under the circumstances, that is not merely inequitable; it is unjust. On the other hand, the Owners' insistence on their right to benefit from bedrock doctrines applicable to all contracts is entirely understandable.

But as I discussed, the Supreme Court of Ohio is currently deciding whether *Ward* is indeed the law in Ohio. Given the uncertain outcome of this question of law, the Owners' likelihood of success on the merits of their claims is also uncertain. The lack of clarity in the legal landscape on this issue leads me to further conclude that, at the very least, this factor of the preliminary-injunction analysis does not clearly demand issuance of an injunction. *See* 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.3 (3d ed. June 2024 Update) ("In many cases the existence of a factual conflict, or of difficult questions of law, may create sufficient doubt about the probability of plaintiff's success to justify denying a preliminary injunction."); *see also Transcon. Gas Pipe Line Co. v. Permanent Easements for 2.14 Acres*, Nos. 17-cv-00715, 17-cv-00723, 2017 WL 1283948, at *5 (E.D. Pa. Apr. 6, 2017) (collecting cases holding the same).

### 2. Irreparable Harm

I next evaluate whether the Owners are likely to suffer irreparable harm without issuance of an injunction. *Higuchi*, *supra*, 103 F.4th at 404. I conclude that they are unlikely to suffer such harm.

As an initial matter, because I have substantial doubt as to whether the Owners are likely to succeed on the merits of their claims, the Owners are not "entitled to a rebuttable presumption of irreparable harm." 15 U.S.C. § 1116(a). But even if the Owners are entitled to such a presumption, the evidence thoroughly rebuts it.

"[S]elf-inflicted harm is not the type that injunctions are meant to prevent." *Livonia Props. Holdings, LLC v. 12840–12976 Farmington Rd. Holdings, LLC*, 399 F. App'x 97, 104 (6th Cir. 2010); *Trico Prods. Corp. v. Integrated Microelectronics USA, Inc.*, No. 24-cv-00996, 2024 WL 3581793, at *3 (N.D. Ohio June 24, 2024) (Ruiz, J.) ("[A] party may not satisfy the

16

irreparable harm requirement if the harm complained of is self-inflicted."); *Posey v. Garland*, No. 23-cv-00051, 2023 WL 5435609, at *10 (E.D. Tenn. Aug. 23, 2023) (collecting cases from other circuits holding the same).

Here, the irreparable harm the Owners complain of is entirely self-inflicted. Critically, the Operators have during the pendency of this litigation consistently expressed a willingness to continue accepting and paying for deliveries of Sunoco fuel from the Owners under the terms of the parties' prior agreements. (*See* Hearing Tr., Doc. 51, PgID. 5193–94). The Operators even filed a motion in state court asking for permission to escrow the monthly rent owed on the disputed sites after the Owners stopped collecting that rent in November 2023. (Doc. 1-3; Doc. 54, PgID. 5404). And the Owners presented no evidence suggesting the Operators ever refused or were unable to meet their financial obligations to the Owners, even after this dispute began.

Nevertheless, in October 2023, the Owners unilaterally stopped supplying fuel to the disputed sites. Far from preserving the status quo during the pendency of this litigation, that decision destroyed it. And from that decision flows the irreparable harms that the Owners now complain of.

These alleged harms include the Operators' infringement of Sunoco trademarks; reputational damage stemming from the Operators' related rebranding of the disputed sites to the Operators' proprietary brand; and the Owners' inability to exploit the commercial benefits of the disputed sites. (Doc. 53, PgID. 5372–75). The Owners also claim irreparable harm stemming from the risk that Sunoco exercises its right to repurchase the sites from the Owners because the sites no longer offer Sunoco fuel. (*Id.* at PgID. 5375–76).

But ending these supposedly irreparable harms and returning the parties to the status quo during the pendency of this litigation remains entirely within the Owners' power. The Owners

put forward no evidence suggesting that Sunoco or some other third party required the Owners to cease supplying the Operators with Sunoco fuel. Instead, the record evidence makes clear that the Owners have brought this harm on themselves. The Owners alone have altered the status quo by unilaterally refusing both to supply the Operators with Sunoco fuel and to accept the Operators' offered rent and fuel payments. Such "self-inflicted wounds are not irreparable injury." *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003).[13]

Further militating against the Owners' claims of irreparable harm is their delay in seeking this preliminary injunction. "[A]n unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013); *see Trico*, *supra*, 2024 WL 3581793, at *3 (finding that the plaintiff's delay of over a month in seeking preliminary relief undermined the plaintiff's claim of irreparable harm).

Here, the Owners were presumably well-aware of their option to cease supplying Sunoco fuel to the Operators on October 18, 2023. Yet the Owners did not file their motion for a preliminary injunction until December 7. The Owners' unreasonable delay of over a month here, like the delay in *Trico*, further undercuts the Owners' claims of irreparable harm.

## Conclusion

I find the Owners have demonstrated neither a likelihood of success on the merits of their claims nor irreparable harm. I am "not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are

---

[13] I have no reason to doubt that the Owners in good faith believe the Operators failed to renew the site leases. And as I noted at the hearing, the Owners may therefore also in good faith decline to supply the Operators with Sunoco fuel. (Hearing Tr., Doc. 50, PgID. 4975). But I will not exercise my equitable powers to enforce the extraordinary remedy of a preliminary injunction where, like the Owners here, the party complaining of harm from a disruption in the status quo is the party who caused and who has the power to repair that disruption.

dispositive of the issue." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). And "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (quotations omitted). I therefore conclude that the Owners have failed to show that the circumstances clearly demand an injunction requiring the Operators to cease selling fuel at the disputed sites.[14]

It is, therefore, ORDERED THAT:

1. The Owners' motion for a preliminary injunction (Doc. 3) be, and the same hereby is, denied.

The Clerk will forthwith set a conference with the parties to discuss the status of any state court cases related to this case, including the need for briefing regarding the Operators' motion to stay certain state court eviction proceedings related to this case, (Doc. 20), as well as any other issues the parties may wish to bring to the Court's attention.

SO ORDERED.

DATE: 8/13/2024

*/s/ James G. Carr*

Sr. U.S. District Judge

---

[14] At the status conference with the parties on July 25, 2024, I tentatively indicated my intent to enjoin the Operators' continued use of the Sunoco trademarks at the disputed sites. This order reflects a subsequent change in my decision upon further review and reflection after that conference.